RHESA HAWKINS BARKSDALE, Circuit Judge:
Away from school or a school function and without using school resources (off-campus speech), Taylor Bell, a student at Itawamba Agricultural High School in Itawamba County, Mississippi, posted a rap recording containing threatening language against two high school teachers/coaches on the Internet (first on his publicly accessible Facebook profile page and then on YouTube), intending it to reach the school community. In the recording, Bell names the two teachers and describes violent acts to be carried out against them. Interpreting the language as threatening, harassing, and intimidating the teachers, the Itawamba County School Board took disciplinary action against Bell.
Bell claims being disciplined violated his First Amendment right to free speech. On cross-motions for summary judgment, the district court ruled, inter alia: the school board, as well as the school-district superintendent, Teresa McNeece, and the school principal, Trae Wiygul, acting in their official capacities (the school board), acted reasonably as a matter of law. Bell v. Itawamba Cnty. Sch. Bd., 859 F.Supp.2d 834 (N.D.Miss.2012).
Primarily at issue is whether, consistent with the requirements of the First Amendment, off-campus speech directed intentionally at the school community and reasonably understood by school officials to be threatening, harassing, and intimidating to a teacher satisfies the almost 50-year-old standard for restricting student speech, based on a reasonable forecast of a substantial disruption. See Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (infringing otherwise-protected school speech requires “facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities”). Because that standard is satisfied in this instance, the summary judgment is AFFIRMED.
I.
On Wednesday, 5 January 2011, Bell, a high-school senior, posted a rap recording on his public Facebook profile page (and later on YouTube), using what appears to be a representation of a Native American as the rap recording’s cover image. (His high-school mascot is a Native American.) The recording, in part, alleges misconduct against female students by Coaches W. and R.
*384 Although there are three different versions of the transcribed rap recording in the summary-judgment record, the school board stipulated, at the preliminary-injunction hearing for this action, to the accuracy of the following version provided by Bell, who refers to himself in the recording as “T-Bizzle”. (Accordingly, except for deleting part of both coaches’ names, the numerous spelling and grammatical errors in the following version are not noted.)
Let me tell you a little story about these Itawamba coaches / dirty ass niggas like some fucking coacha roaches / started fucking with the white and know they fucking with the blacks / that pussy ass nigga W[.] got me turned up the fucking max/
Fucking with the students and he just had a baby / ever since I met that cracker I knew that he was crazy / always talking shit cause he know I’m from daw-city / the reason he fucking around cause his wife ain’t got no tidies / This niggha telling students that they sexy, betta watch your back / I’m a serve this nigga, like I serve the junkies with some crack / Quit the damn basketball team / the coach a pervert / can’t stand the truth so to you these lyrics going to hurt
What the hell was they thinking when they hired Mr. R[.] / dreadlock Bobby Hill the second / He the same see / Talking about you could have went pro to the NFL / Now you just another pervert coach, fat as hell / Talking about you gangsta / drive your mama’s PT Cruiser / Run up on T-Bizzle / I’m going to hit you with my rueger Think you got some game / cuz you fucking with some juveniles / you know this shit the truth so don’t you try to hide it now / Rubbing on the black girls ears in the gym / white hoes, change your voice when you talk to them / I’m a dope runner, spot a junkie a mile away / came to football practice high / remember that day /1 do / to me you a fool / 30 years old fucking with students at the school
Hahahah / You’s a lame / and it’s a dam shame / instead you was lame / eat shit, the whole school got a ring mutherfucker
Heard you textin number 25 / you want to get it on / white dude, guess you got a thing for them yellow bones / looking down girls shirts / drool running down your mouth / you fucking with the wrong one / going to get a pistol down your mouth / Bourn
OMG / Took some girls in the locker room in PE / Cut off the lights / you motherfucking freak / Fucking with the youngins / because your pimpin game weak / How he get the head coach / I don’t really fucking know / But I still got a lot of love for my nigga Joe / And my nigga Makaveli / and my nigga codie / W[.] talk shit bitch don’t even know me
Middle fingers up if you hate that nigga / Middle fingers up if you can’t stand that nigga / middle fingers up if you want to cap that nigga / middle fingers up / he get no mercy nigga
(Emphasis added.)
At the very least, this incredibly profane and vulgar rap recording had at least four instances of threatening, harassing, and intimidating language against the two coaches:
1. “betta watch your back / I’m a serve this nigga, like I serve the junkies with some crack”;
2. “Run up on T-Bizzle / I’m going to hit you with my rueger”;
3. “you fucking with the wrong one / going to get a pistol down your mouth/Boww”; and
*385 4. “middle fingers up if you want to cap that nigga / middle fingers up / he get no mercy nigga”.
Bell’s use of “rueger” [sic] references a firearm manufactured by Sturm, Ruger & Co.; to “cap” someone is slang for “shoot”.
A screenshot of Bell’s Facebook profile page, taken approximately 16 hours after. he posted the rap recording, shows his profile, including the rap recording, was open to, and viewable by, the public. In other words, anyone could listen to it.
On Thursday, 6 January, the day after the recording was posted, Coach W. received a text message from his wife, informing him about the recording; she had learned about it from a friend. After asking a student about the recording, the coach listened to it at school on the student’s smartphone (providing access to the Internet). The coach immediately reported the rap recording to the school’s principal, Wiygul, who informed the school-district superintendent, McNeece.
The next day, Friday, 7 January, Wiygul, McNeece, and the school-board attorney, Floyd, questioned Bell about the rap recording, including the veracity of the allegations, the extent of the alleged misconduct, and the identity of the students involved. Bell was then sent home for the remainder of the day.
Because of inclement weather, the school was closed through Thursday, 13 January. During Bell’s resulting time away from school, and despite his having spoken with school officials about his rap recording, including the accusations against the two coaches, Bell created a finalized version of the recording (adding commentary and a picture slideshow), and uploaded it to YouTube for public viewing.
Bell returned to school when it reopened on Friday, 14 January; he was removed from class midday by the assistant principal and told he was suspended, pending a disciplinary-committee hearing. (He was permitted to remain in the school commons until the school bus he rode arrived at the end of the day.) By letter that day to Bell’s mother, the superintendent informed her: Bell’s suspension would continue until further notification; and a hearing would be held to consider disciplinary action for Bell’s “alleged threatening intimidation and/or harassment of one or more school teachers”. The listed, possible basis for such action was consistent with the school district’s administrative disciplinary policy, which lists “[h]arassment, intimidation, or threatening other students and/or teachers” a$ a severe disruption.
The disciplinary-committee hearing, originally scheduled for Wednesday, 19 January, was delayed at Bell’s mother’s request; it was held on Wednesday, 26 January. Although there is no transcript of the hearing, it was recorded; that recording is in the summary-judgment record. The hearing was facilitated by the school-board attorney, Floyd; three disciplinary-committee members were present, as well as the school principal and Bell, his mother, and their attorney.
The hearing began with the principal’s providing a summary of events, after which the YouTube version of the rap recording was played. Among the disciplinary-committee members’ questions, one member asked Bell whether he had reported the alleged misconduct to school officials. Bell explained he had not done so because he believed they would ignore his complaints. Instead, he made the rap recording because he knew people were “gonna listen to it, somebody’s gonna listen to it”, acknowledging several times during the hearing that he posted the recording to Facebook because he knew it would be viewed and heard by students. *386 Moreover, he explained that at least 2,000 people had contacted him about the rap recording in response to the Facebook and YouTube postings.
One of the committee members asked Bell why he had posted a new version of the rap recording on YouTube, after school officials had discussed with him his posting it on Facebook. Bell gave a few (and somewhat conflicting) explanations: the Facebook version was a raw copy, so he wanted a finalized version on YouTube; the Facebook version was for his friends and “people locally” to hear, whereas the YouTube version was for music labels to hear; and he posted the YouTube version with a slideshow of pictures to help better explain the subject matter of the recording (his Facebook version only included a brief explanation of the backstory in the caption to the rap recording).
Although Bell’s attorney, at one point, attempted to discuss the misconduct of the coaches alleged in the rap recording, the school-board attorney redirected the proceeding to its purpose: to resolve whether Bell threatened, harassed, and intimidated the teachers; and, to decide whether his suspension should be upheld. In numerous instances, the school-board attorney emphasized this purpose, noting Bell’s “comments made [in the recording that] ‘you’ve f — ed with the wrong one / going to get a pistol down your mouth / POW’[,] those are threats to a teacher”.
Bell contested the school-board attorney’s interpretation, responding: “Well that ain’t really what I said”; and then provided what he described as the written “original copy” of what had been recorded. (It is unclear from the disciplinary-committee-hearing recording, or other parts of the summary-judgment record, which copy Bell provided.) Bell explained he did not mean he was going to shoot anyone, but that he was only “foreshadowing something that might happen”. (Emphasis added.) But, he agreed that individuals “outside the school setting” had made “certain statements” to his mother that “ ‘put a pistol down your mouth’[,] that is a direct threat”.
Near the end of the disciplinary-committee hearing, Bell explained again: he put the recording on Facebook and YouTube knowing it was open to public viewing; part of his motivation was to “increase awareness of the situation”; and, although he did not think the coaches would hear the recording and did not intend it to be a threat, he knew students would listen to it, later stating “students all have Facebook”.
On 27 January, the day after the hearing, the school-board attorney informed Bell’s mother by letter that: the disciplinary committee had determined “the issue of whether or not lyrics published by Taylor Bell constituted threats to school district teachers was vague”, but that the publication of the recording constituted harassment and intimidation of two teachers, in violation of school-district policy and state law; as a result, the disciplinary committee recommended to the school board that Bell’s seven-day suspension be upheld and that he be placed in the county’s alternative school for the remainder of the nine-week grading period (approximately six weeks); Bell would not be “allowed to attend any school functions and [would] be subject to all rules imposed by the Alternative School”; and “[he would] be given time to make up any work missed while suspended or otherwise receive a 0, pursuant to Board policy”.
After being informed of the disciplinary-committee’s recommendation, Bell’s attorney informed the school-board attorney, by 31 January telephone call, that: Bell wished to appeal to the school board the disciplinary-committee’s recommendation; and, although Bell and his mother were *387 expected to appear at the board meeting on 7 February, they would be without counsel because he was unable to attend due to a scheduling conflict.
On 7 February, the school board, after being presented with a recitation of the recording, unanimously found: Bell “threatened, harassed and intimidated school employees”. (The only document in the record from the school-board meeting is the minutes, which state: “Chairman Tony Wallace entertained a motion by Clara Brown to accept the discipline recommendation of the Discipline Committee regarding student with MSIS # 000252815 (I.A.H.S.) and finding that this student threatened, harassed and intimidated school employees. Wes Pitts seconded the motion. Motion Carried Unanimously.”) In other words, unlike the earlier-described disciplinary committee findings, which do not characterize the rap recording as threatening (instead, finding that point “vague”), the school board found Bell had not only harassed and intimidated the teachers, but had also threatened them.
By 11 February letter to Bell’s mother, the school-board attorney explained the board’s findings: “Bell did threaten, harass and intimidate school employees in violation of School Board policy and Mississippi State Law”. (Again, as stated in the written school-district policy, “[harassment, intimidation, or threatening other students and/or teachers” constitutes a severe disruption.)
Approximately two weeks later, on 24 February, Bell and his mother filed this action, claiming, inter alia, the school board, superintendent, and principal (again, the school board) violated his First Amendment right to free speech. On 2 March, Bell requested a preliminary injunction, seeking his immediate reinstatement to his high school, including the reinstatement of “all privileges to which he was and may be entitled as if no disciplinary action had been imposed”, and all references to the incident being expunged from his school records.
At the 10 March hearing for the requested injunction, Bell presented four affidavits from students at his school concerning alleged misconduct by the coaches. (The affidavits, however, were not considered by the court.) In addition, Bell, his mother, school-board attorney Floyd, and Franklin (offered as an expert in rap music) were called as witnesses by Bell; superintendent McNeece ‘and Coaches R. and W., by the school district.
Bell testified about his making and disseminating the recording; the meaning behind certain statements in it; and the resulting events leading up to, and after, school officials disciplined him. Bell’s mother testified about her recollection of the events leading up to the disciplinary-committee and school-board hearings. She testified the school principal never stated Bell was dangerous or threatening, and that Bell was told to stay in the school before suspending him.
Floyd testified about her recollection of the events before, during, and after the disciplinary-committee and school-board hearings. During her testimony, the court noted Bell’s contention that the rap recording addressed a matter of public concern. Floyd discussed the school-district policy Bell violated: he threatened, harassed, and intimidated school employees; similarly, she testified that, at their respective hearings, the disciplinary committee and the school board discussed the possibility of disruption.
Over the school-district’s objection, Franklin was permitted to testify as an expert. Characterizing the statements in Bell’s recording as nothing more than “colorful language” used to entice listeners *388 and reflective of the norm among young rap artists, Franklin testified that it gave him no cause for concern. On cross-examination, however, he testified: if an individual’s name is used in a rap recording and precedes the words “[p]ut a pistol in your mouth and cap him”, “it would definitely be cause for a conversation with the young man, absolutely”.
The superintendent testified: she had attended the school-board meeting; there was a foreseeable danger of substantial disruption at the school as a result of the rap recording; and, a written version of Bell’s rap recording was presented to the school board, before it adopted the disciplinary-committee’s recommendation for suspension and temporary placement in the alternative school.
Both coaches identified in the rap recording testified that it adversely affected their work at the school. Coach R. testified: subsequent to the publication of the recording, students began spending more time in the gym, despite teachers’ telling them to remain in classrooms; and the recording affected him in the way he conducted himself around students, noting he would no longer work with female members of the track team, instead instructing males on the team on how to coach the females and then having the males do so. Coach W. testified he: interpreted the statements in the rap recording literally, after hearing it on a student’s smartphone at school; was “scared”, because “you never know in today’s society ... what somebody means, [or] how they mean it”; and would not allow the members of the school basketball team he coached to leave after games until he was in his vehicle.
After-finding Bell’s last day attending the alternative school would be the next day, 11 March, the district court ruled whether to grant injunctive relief was moot. Accordingly, the requested injunction was denied.
It does not appear that any discovery took place after the preliminary-injunction hearing. On 9 May, following a ease-management conference, the magistrate judge entered an order stating: “it appears that there are no factual issues and that this case should be resolved by motions for summary judgment”; and the parties had 90 days to file those motions.
Therefore, approximately three months later, the school board filed its summary-judgment motion on 1 August; Bell and his mother, on 5 August. On 15 March 2012, the district court denied the Bells’ motion and granted the school board’s. In doing so, it concluded the rap recording constituted “harassment and intimidation of teachers and possible threats against teachers and threatened, harassed, and intimidated school employees”. Bell, 859 F.Supp.2d at 840 (internal quotation marks omitted). The court also concluded the rap recording “in fact caused a material and/or substantial disruption at school and ... it was reasonably foreseeable to school officials the song would cause such a disruption”. Id. Moreover, the court concluded, inter alia: (1) the superintendent and principal were entitled to qualified immunity in their individual capacities; and (2) Bell’s mother could not show a violation of her Fourteenth Amendment rights (she claimed the school’s disciplining Bell violated her right to make decisions regarding the custody and care of her son). Id. at 841^2.
On.appeal, only the summary judgment against Bell’s First Amendment claim was challenged. A divided panel in December 2014 held, inter alia: the school board violated Bell’s First Amendment right by disciplining him based on the language in' the rap recording. Bell v. Itawamba Cnty. Sch. Bd., 774 F.3d 280, 304-05 (5th Cir. *389 2014), reh’g en banc granted & opinion vacated, 782 F.3d 712 (5th Cir.2015). Enbanc review was granted in February 2015.
II.
Because the summary judgment against Bell’s mother’s Fourteenth Amendment claim and for the school officials’ qualified-immunity claim was not contested on appeal, the only issue before our en-banc court is the summary judgment against Bell’s First Amendment claim. (The misconduct alleged by Bell against the two teachers is, of course, not at issue.)
A summary judgment is reviewed de novo, applying the same standard as did the district .court. E.g., Feist v. La., Dep’t of Justice, Office of the Att’y Gen., 730 F.3d 450, 452 (5th Cir.2013). Summary judgment is proper when “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law”. Fed.R.Civ.P. 56(a). “A genuine dispute of fact exists when evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, and a fact is material if it might affect the outcome of the suit.” Willis v. Cleco Corp., 749 F.3d 314, 317 (5th Cir.2014) (citations and quotation marks omitted).
In determining whether to grant summary judgment, the court, in its de novo review, views the evidence in the light most favorable to the nonmovant. E.g., Dameware Dev., L.L.C. v. Am. Gen. Life Ins. Co., 688 F.3d 203, 206-07 (5th Cir.2012). Consistent with that, on cross-motions for summary judgment, “we review [de novo ] each party’s motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party”. Cooley v. Hous. Auth. of Slidell, 747 F.3d 295, 298 (5th Cir.2014) (internal quotation marks omitted) (quoting Ford Motor Co. v. Tex. Dep’t of Transp., 264 F,3d 493, 498 (5th Cir.2001)).
The summary-judgment record at hand includes, inter alia: (1) the affidavits of four students regarding the coaches’ alleged misconduct; (2) screenshots of Bell’s Facebook page; (3) a transcription of the rap recording submitted by the school board; (4) a transcription of the recording submitted by Bell (stipulated version); (5) the letter from the superintendent to Bell’s mother, informing the Bells of a hearing before the disciplinary committee; (6) the digital recording of the rap recording; (7) the first screenshot of Bell’s Facebook “wall”; (8) the second screenshot of Bell’s Facebook “wall”; (9) the recording of the disciplinary-committee hearing; (10) the minutes of that hearing, containing the recommended disciplinary action; (11) the school-board attorney’s letter to Bell’s mother, informing her of the disciplinary committee’s findings and recommended discipline; (12) the school-board-hearing minutes; (13) the school-district’s discipline policy; (14) the school-board attorney’s letter to Bell’s mother informing her of the school-board’s determination; and (15) the transcript of the preliminary-injunction hearing.
A.
Students qua students do not forfeit their First Amendment rights to freedom of speech and expression. Tinker, 393 U.S. at 506, 511, 89 S.Ct. 733 (“School officials do not possess absolute authority over their students.... In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.”). On the other hand, the First Amendment does not provide students absolute rights to such freedoms, and those rights must be tempered in the light of a school official’s duty to, *390 inter alia, “teach[] students the boundaries of socially appropriate behavior”, Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 681, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), and “protect those entrusted to their care”, Morse v. Frederick, 551 U.S. 393, 408, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007). As Justice Oliver Wendell Holmes, Jr., wrote nearly a century ago: “[T]he character of every act depends upon the circumstances in which it is done. The most stringent protection of’free speech would not protect a man in falsely shouting fire in a theatre and causing a panic.” Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (citation omitted). Therefore, because “the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings”, Fraser, 478 U.S. at 682, 106 S.Ct. 3159, certain speech, which would be protected in other settings, might not be afforded First Amendment protection in the school setting.
Balancing these competing interests, Tinker provided in 1969 the standard for evaluating whether the First Amendment protects a student’s speech. There, the Court considered the suspension of students for wearing black armbands in protest against the Vietnam War. Tinker, 393 U.S. at 505-14, 89 S.Ct. 733. In holding the students’ speech protected under the First Amendment, the Court, focusing primarily on the effect of that speech on the school community, held: A student “may express his opinions ... if he does so without materially and substantially interfering] with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others ”. Id. at 513, 89 S.Ct. 733 (alteration in original) (emphasis added) (internal quotation marks omitted). Put another way, “conduct by the student, in class or out of it, which for any reason ... materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized ... ”. Id. (emphasis added). Approximately three years after Tinker, our court held this standard can be satisfied either by showing a disruption has occurred, or by showing “demonstrable factors that would give rise to any reasonable forecast by the school administration of ‘substantial and material’ disruption”. Shanley v. Ne. Indep. Sch. Dist., Bexar Cnty., Tex., 462 F.2d 960, 974 (5th Cir. 1972) (emphasis added) (holding school’s suspension of students for their off-campus distribution of “underground” newspaper violated Tinker).
Since Tinker, the Court has revisited student speech on several occasions, each time carving out narrow exceptions to the general Tinker standard based on certain characteristics, or content, of the speech. See, e.g., Morse, 551 U.S. at 425, 127 S.Ct. 2618 (Alito, j, concurring) (grave and unique threats to the physical safety of students, in particular, speech advocating illegal drug use); Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (school-sponsored speech); Fraser, 478 U.S. at 685, 106 S.Ct. 3159 (lewd, vulgar, or indecent speech); see also Morgan v. Swanson, 659 F.3d 359, 374 (5th Cir.2011) (en banc) (describing the Court’s holdings as “expand[ing] the kinds of speech schools- can regulate.... to several broad categories of student speech” (internal quotation marks omitted)). In Fraser, the Court held the school board acted within its authority when it disciplined a student for an “offensively lewd and indecent” speech delivered at a student assembly. 478 U.S. at 677-78, 685, 106 S.Ct. 3159. In Hazelwood, the Court upheld a school’s right to “exereis[e] editorial control over the style and content of student speech” in a school-sponsored *391 newspaper when the student engages in “expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school” and the school officials’ “actions are reasonably related to legitimate pedagogical concerns”. 484 U.S. at 262, 271, 273, 108 S.Ct. 562.
And, most recently in Morse, the Court considered whether a school infringed a student’s First Amendment right of free speech when it disciplined him for holding up a banner that stated “BONG HiTS 4 JESUS” at a school-sponsored event. 551 U.S. at 397-98,127 S.Ct. 2618. The Court, through Justice Alito’s controlling concurrence (joined by Justice Kennedy), held a school may discipline a student for speech which poses a “grave and ... unique threat to the physical safety of students”, such as “advocating illegal drug use”. Id. at 425, 127 S.Ct. 2618. (Justice Alito limited his “join[ing] the opinion of the Court on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions”. Id. at 423, 127 S.Ct. 2618.)
For these exceptions, schools are not required to prove the occurrence of an actual disruption or one that reasonably could have been forecast. Similarly, in Ponce v. Socorro Independent School District, our court extended the Morse exception to certain threats of school violence. 508 F.3d 765, 771-72 (5th Cir.2007). In response to a diary brought to school containing “terroristic threat[s]” mirroring recent mass school shootings, the school suspended the student. Id. at 767. On appeal, our court upheld the suspension as constitutional, extending Morse’s exception to speech “bearing the stamp of ... mass, systematic school-shootings” básed on the “[l]aek of forewarning and the frequent setting within schools [which] give mass shootings the unique indicia that the concurring opinion [in Morse ] found compelling with respect to drug use”. Id. at 771.
In challenging the summary judgment', Bell claims the school board violated his First Amendment free-speech rights by temporarily suspending him and placing him in an alternative school for the six weeks remaining in the grading period. In support, he contends: Tinker does not apply to off-campus speech, such as his rap recording; and, even if it does, Tinker’s “substantial disruption” test is not satisfied. For the reasons that follow, we hold: Tinker applies to the off-campus speech at issue; there is no genuine dispute of material fact precluding ruling, as a matter of law, that a school official reasonably could find Bell’s rap recording threatened, harassed, and intimidated the two teachers; and a substantial disruption reasonably could have been forecast, as a matter of law.
1.
[7] As our court explained in Morgan v. Swanson, student-speech claims are evaluated “in light of the special characteristics of the school environment, beginning by categorizing the student speech at issue”. 659 F.3d at 375 (footnotes and internal quotation marks omitted). We must thus decide whether Bell’s speech falls under Tinker, or one of the Court’s above-described exceptions. See, e.g., Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 214 (3d Cir.2001) (employing a similar approach, noting “[s]peech falling outside of ... categories [such as those in Fraser and Hazelwood] is subject to Tinker’s general rule”).
The parties do not assert, and the record does not show, that the school board disciplined Bell based on the lewdness of his speech or its poten *392 tial perceived sponsorship by the school; therefore, Fraser and Hazelwood are not directly on point. Bell’s speech likewise does not advocate illegal drug use or portend a Columbine-like mass, systematic school-shooting. And, as Justice Abito noted, when the type of violence threatened does not implicate “the special features of the school environment”, Tinker’s “substantial disruption” standard is the appropriate vehicle for analyzing such claims. Morse, 551 U.S. at 425, 127 S.Ct. 2618 (citing Tinker, 393 U.S. at 508-09, 89 S.Ct. 733) (“[I]n most .cases, Tinker’s ‘substantial disruption’ standard permits school officials to step in before actual violence erupts”.). Although threats against, and harassment and intimidation of, teachers certainly pose a “grave ... threat to the physical safety” of members of the school community, id., violence forecast by a student against a teacher does not reach the level of the above-described exceptions necessitating divergence from Tinker’s general rule. We therefore analyze Bell’s speech under Tinker. See Ponce, 508 F.3d at 771-72 & n. 2 (“[Because [threats of violence against individual teachers] are relatively discrete in scope and directed at adults, [they] do not amount to the heightened level of harm that was the focus of both the majority opinion and Justice Alito’s concurring opinion in Morse ”.); see also Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Disk, 494 F.3d 34, 38 (2d Cir.2007) (analyzing threats of violence to individual teachers under Tinker); Boim v. Fulton Cnty. Sch. Disk, 494 F.3d 978, 982-83 (11th Cir.2007) (same).
2.
In claiming Tinker does not apply to off-campus speech, Bell asserts: Tinker limits its holding to speech inside the “schoolhouse gate”; and each of the Court’s subsequent decisions reinforces this understanding.
“Experience shows that schools can be places of special danger.” Morse, 551 U.S. at 424, 127 S.Ct. 2618 (Alito, J., concurring). Over 45 years ago, when Tinker was decided, the Internet, cellphones, smartphones, and digital social media did not exist. The advent of these technologies and their sweeping adoption by students present new and evolving challenges for school administrators, confounding previously delineated boundaries of permissible regulations. See, e.g., Wynar v. Douglas Cnty. Sch. Disk, 728 F.3d 1062, 1064 (9th Cir.2013) (“With the advent of the Internet and in the wake of school shootings at Columbine, Santee, Newtown and many others, school administrators face the daunting task of evaluating potential threats of violence and keeping their students safe without impinging on their constitutional rights.”). Students now have the ability to disseminate instantaneously and communicate widely from any location via the Internet. These communications, which may reference events occurring, or to occur, at school, or be about members of the school community, can likewise be accessed anywhere, by anyone, at any time. Although, under other circumstances, such communications might be protected speech under the First Amendment, off-campus threats, harassment, and intimidation directed at teachers create a tension between a student’s free-speeeh rights and a school official’s duty to maintain discipline and protect the school community. These competing concerns, and differing standards applied to off-campus speech across circuits, as discussed infra, have drawn into question the scope of school officials’ authority. See Morse, 551 U.S. at 418, 127 S.Ct. 2618 (Thomas, J., concurring) (lamenting the Court’s failure to “offer an explanation of when [Tinker ] operates and *393 when it does not”, and noting: “I am afraid that our jurisprudence now says that students have a right to speak in schools except when they do not”).
Greatly affecting this landscape is the recent rise in incidents of violence against school communities. See LaVine v. Blaine Sch. Dist., 257 F.3d 981, 987 (9th Cir.2001) (“[W]e live in a time when school violence is an unfortunate reality that educators must confront on an all too frequent basis”.). School administrators must be vigilant and take seriously any statements by students resembling threats of violence, Ponce, 508 F.3d at 771, as well as harassment and intimidation posted online and made away from campus. This now-tragically common violence increases the importance of clarifying the school’s authority to react to potential threats before violence erupts. See Morse, 551 U.S. at 408, 127 S.Ct. 2618 (pressing that dangerous speech, such as speech advocating drug use, is substantially different from the political speech at issue in Tinker, because it presents a “far more serious and palpable” danger than an “undifferentiated fear or apprehension of disturbance” or “a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint” (citation and internal quotation marks omitted)); see also Ponce, 508 F.3d at 772 (“School administrators must be permitted to react quickly and decisively to address a threat of physical violence ... without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance.”).
In the light of these competing interests and increasing concerns regarding school violence, it is necessary to establish the extent to which off-campus student speech may be restricted without offending the First Amendment. Our holding concerns the paramount need for school officials to be able to react quickly and efficiently to protect students and faculty from threats, intimidation, and harassment intentionally directed at the school community. See, e.g., Morse, 551 U.S. at 425, 127 S.Ct. 2618 (Alito, J., concurring) (“[D]ue to the special features of the school environment, school officials must have greater authority to intervene before speech leads to violence.”); Lowery v. Enverara, 497 F.3d 584, 596 (6th Cir.2007) (“School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place.”).
a.
Despite Bell’s recognizing the wealth of precedent across numerous circuits contrary to his position, he asserts: Tinker does not apply to speech which originated, and was disseminated, off-campus, without the use of school resources. Bell’s position is untenable; it fails to account for evolving technological developments, and conflicts not only with our circuit’s precedent, but with that of every other circuit to- have decided this issue.
Since Tinker was decided in 1969, courts have been required to define its scope. As discussed below, of the six circuits to have addressed whether Tinker applies to off-campus speech, five, including our oum, have held it does. (For the other of the six circuits (the third circuit), there is an intra-circuit split. See Layshock v. Hermitage Sch. Dist., 650 F.3d 205, 219-20 (3d Cir.2011) (en banc) (Jordan, J., concurring) (discussing that Tinker's applicability to off-campus speech remains unresolved in the third circuit); see also J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 931 & n. 8 (3d Cir.2011) (en banc) (divided court assuming, without deciding, that the Tinker substantial-disrup *394 tion test applies to online speech harassing a school administrator).) The remainder of the circuits (first, sixth, seventh, tenth, eleventh, D.C.) do not appear to 'have addressed this issue.
Although the Supreme Court has not expressly ruled on this issue, our court, 43 years ago, applied Tinker to analyze whether a school board’s actions were constitutional in disciplining students based on their off-campus speech. E.g., Shanley, 462 F.2d at 970 (“When the Bum-side/Tinker standards are applied to this case ... ”.); see also Sullivan v. Hous. Indep. Sch. Dist., 475 F.2d 1071, 1072 (5th Cir.1973) (“This case arises from the unauthorized distribution of an underground newspaper near a high school campus, and presents the now-familiar clash between claims of First Amendment protection on the one hand and the interests of school boards in maintaining an atmosphere in the public schools conducive to learning, on the other.” (emphasis added)); Wisniewski, 494 F.3d at 39 (interpreting Sullivan as applying Tinker to off-campus speech); Porter v. Ascension Parish Sch. Bd., 898 F.3d 608, 615 n. 22, 619 n. 40 (5th Cir.2004) (same).
In Shanley, students distributed newspapers containing articles they authored “during out-of-school hours, and without using any materials or facilities owned or operated by the school system”, “near but outside the school premises on the sidewalk of an adjoining street, separated from the school by a parking lot”. 462 F.2d at 964. In concluding the students’ speech was protected, our court ruled: “[T]he activity punished here does not even approach the ‘material and substantial’ disruption ... either in fact or in reasonable forecast [and] [a]s a factual matter ... there were no disturbances of any sort, on or off campus, related to the distribution of the [newspaper]”. Id. at 970.
Further, as noted supra, four other circuits have held that, under certain circumstances, Tinker applies to speech which originated, and was disseminated, off-campus. See, e.g., Wynar, 728 F.3d at 1069; D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60, 647 F.3d 754, 766-67 (8th Cir.2011); Kowalski v. Berkeley Cnty. Schs., 652 F.3d 565, 573-74 (4th Cir.2011); Doninger v. Niehoff, 527 F.3d 41, 48-50 (2d Cir.2008). Therefore, based on our court’s precedent and guided by that of our sister circuits, Tinker applies to off-campus speech in certain situations.
b.
Therefore, the next question is under what circumstances may off-campus speech be restricted. Our court’s precedent is less developed in this regard. For the reasons that follow, and in the light of the summary-judgment record, we need not adopt a specific rule: rather, Bell’s admittedly intentionally directing at the school community his rap recording containing threats to, and harassment and intimidation of, two teachers permits Tinker ’s application in this instance.
i.
In 1972 in Shanley, our court expressly declined to adopt a rule holding a school’s attempt to regulate off-campus speech under Tinker was per se unconstitutional. '462 F.2d at 974. Our court explained: “[E]ach situation involving expression and discipline will create its own problems of reasonableness, and for that reason we do not endeavor here to erect any immovable rules, but only to sketch guidelines”. Id. Likewise, in 1973 in Sullivan, our court considered Tinker, but did not address any parameters for its application to off-campus speech. 475 F.2d at 1076-77.
Our court’s far more recent, 2004 opinion in Porter, however, provides valuable *395 insight in this regard. There, the school expelled a student after his brother brought to school a sketchpad containing a two-year-old drawing of the school’s being attacked by armed personnel. 393 F.3d at 611. The depiction, albeit violent in nature, “was completed [at] home, stored for two years, and never intended by [the creator of the drawing] to be brought to campus”. Id. at 615 (emphasis added). After concluding Tinker applied to the school’s regulations, our court held the speech was protected because the student never intended for the drawing to reach the school, describing its introduction to the school community as “accidental and unintentional”. Id. at 618, 620 (“Because [the student’s] drawing was composed off-campus, displayed only to members of his own household, stored off-campus, and not purposefully taken by him to [school]- or publicized in a way certain to result in its appearance at [school], we have found that the drawing is protected by the First Amendment”.). Of importance for the issue at hand, and after describing precedent from our and other circuits’ applying Tinker to off-campus speech, our court stated its holding was “not in conflict with this body of case law” regarding the First Amendment and off-campus student speech because the drawing’s being “composed off-campus and remain[ing] off-campus for two years until it was unintentionally taken to school by his younger brother takes the present case outside the scope of these precedents”. Id. at 615 n. 22 (emphasis added).
Porter instructs that a speaker’s intent matters when determining whether the off-campus speech being addressed is subject to Tinker. A speaker’s intention that his speech reach the school community, buttressed by his actions in bringing about that consequence, supports applying Tinker ’s school-speech standard to that speech.
In addition, those courts to have considered the circumstances under which Tinker applies to off-campus speech have advocated varied approaches. E.g., Wynar, 728 F.3d at 1069 (holding that, regardless of the location of the speech, “when faced with an identifiable threat of school violence [ (threats communicated online via MySpace messages) ], schools may take disciplinary action in response to off-campus speech that meets the requirements of Tinker ”); Snyder, 650 F.3d at 940 (Smith, J., concurring) (noting that any standard adopted “cannot turn solely on where the speaker was sitting when the speech was originally uttered [because s]uch a standard would fail to accommodate the somewhat ‘everywhere at once’ nature of the [I]nternet”, and advocating allowing schools to discipline off-campus speech “[r]egardless of its place of origin” so long as that speech was “intentionally directed towards a school”); Kowalski, 652 F.3d at 573 (applying Tinker when a “sufficiently strong” nexus exists between the student’s speech and the school’s pedagogical interests “to justify the action taken by school officials in carrying out their role as the trustees of the student body’s well-being”); D.J.M., 647 F.3d at 766 (applying Tinker because “it was reasonably foreseeable that [the student’s] threats about shooting specific students in school would be brought to the attention of school authorities and create a risk of substantial disruption within the school environment”); Doninger, 527 F.3d at 48 (holding Tinker applies to speech originating off-campus if it “would foreseeably create a risk of substantial disruption within the school environment, at least when it was similarly foreseeable that the off-campus expression might also reach campus” (internal quotation marks omitted)).
The pervasive and omnipresent nature of the Internet has obfuscated the on- *396 campus/off-campus distinction advocated by Bell, “makfing] any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools”. Layshock, 650 F.3d at 220-21 (Jordan, J., concurring). Accordingly, in the light of our court’s precedent, we hold Tinker governs our analysis, as in this instance, when a student intentionally directs at the school community speech reasonably understood by school officials to threaten, harass, and intimidate a teacher, even when such speech originated, and was disseminated, off-campus without the use of school resources.
This holding is consistent with our circuit’s precedent in Shanley and Sullivan, that of our sister circuits, and our reasoning in Porter. Further, in holding Tinker applies to the off-campus speech in this instance, because such determinations are heavily influenced by the facts in each matter, we decline: to adopt any rigid standard in this instance; or to adopt or reject approaches advocated by other circuits.
ii.
Turning to the matter before us, there is no genuine dispute of material fact that Bell intended his rap recording to reach the school community. He admitted during the disciplinary-committee hearing that one of the purposes for producing the recording was to “increase awareness of the [alleged misconduct]” and that, by posting the rap recording on Facebook and YouTube, he knew people were “gonna listen to it, somebody’s gonna listen to it”, remarking that “students all have Face-book”. In short, Bell produced and disseminated the rap recording knowing students, and hoping administrators, would listen to it.
Further, regardless of whether Bell’s statements in the rap recording qualify as “true threats”, as discussed in part II.B., they constitute threats, harassment, and intimidation, as a layperson would understand the terms. The Oxford English Dictionary defines: “threaten” as “to declare (usually conditionally) one’s intention of inflicting injury upon” another, 17 Oxford English Dictionary 998 (2d ed.1989); “harass” as “[t]o wear out, tire out, or exhaust with fatigue, care, [or] trouble”, 6 id. at 1100 (emphasis in original); and “intimidate” as “[t]o render timid, inspire with fear; [or] to force to or deter from some action by threats or violence”, 8 id. at 7-8. See also Black’s Law Dictionary 1708 (10th ed.2014) (defining “threat” as “[a] communicated intent to inflict harm or loss on another or on another’s property”); id. at 831 (defining “harassment” as “[w]ords, conduct, or action ... that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose”); Elonis v. United States, — U.S. -, 135 S.Ct. 2001, 2011-12, 192 L.Ed.2d 1 (2015) (explaining that a “threat” can have different definitions based on context (for example, the difference between its use in criminal statutes and its being protected speech under the First Amendment)).
A reasonable understanding of Bell’s statements satisfies these definitions; they: threatened violence against the two coaches, describing the injury to be inflicted (putting the pistol down their mouths and pulling the trigger, and “capping” them), described the specific weapon (a “rueger” [sic], which, as discussed supra, is a type of firearm), and encouraged others to engage in this action; and harassed and intimidated the coaches by forecasting the aforementioned violence, warning them to “watch [their] back[s]” and that they would “get no mercy” when such actions *397 were taken. Accordingly, as further discussed infra, there is no genuine dispute of material fact that Bell threatened, harassed, and intimidated the coaches by intentionally directing his rap recording at the school community, thereby subjecting his speech to Tinker.
3.
Having held Tinker applies in this instance, the next question is whether Bell’s recording either caused an actual disruption or reasonably could be forecast to cause one. Taking the school board’s decision into account, and the deference we must accord it, see, e.g., Wood v. Strickland, 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), overruled in part on other grounds, Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Shanley, 462 F.2d at 975; Callahan v. Price,. 505 F.2d 83, 87 (5th Cir. 1974), this question becomes whether a genuine dispute of material fact exists regarding the reasonableness of finding Bell’s rap recording threatening, harassing, and intimidating; and, if no genuine dispute precludes that finding, whether such language, as a matter of law, reasonably could have been forecast to cause a substantial disruption.
a.
As noted by our court in Shanley, “in deference to the judgment of the school boards, we refer ad hoc resolution of ... issues [such as this one] to the neutral corner of ‘reasonableness’”. 462 F.2d at 971; see also id. at 975 (“[T]he balancing of expression and discipline is an exercise in judgment for school administrations and school boards, subject only to the constitutional requirement of reasonableness under the circumstances”.). For the reasons discussed supra, there is no genuine dispute of material fact that the school board’s finding the rap recording threatened, harassed, and intimidated the two coaches was objectively reasonable.
b.
Next, we consider whether the school board’s disciplinary action against Bell, based on its finding he threatened, harassed, and intimidated two coaches, satisfies Tinker. Arguably, a student’s threatening, harassing, and intimidating a teacher inherently portends a substantial disruption, making feasible a per se rule in that regard. We need not decide that question because, in the light of this summary-judgment record, and for the reasons that follow, Bell’s conduct reasonably could have been forecast to cause a substantial disruption.
i.
As discussed supra, Tinker allows a school board to discipline a student for speech that either causes a substantial disruption or reasonably is forecast to cause one. 393 U.S. at 514, 89 S.Ct. 733. The Tinker test is satisfied when: an actual disruption occurs; or the record contains .facts “which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities”. Id.
“Tinker requires a specific and significant fear of disruption, not just some remote apprehension of disturbance.” Saxe, 240 F.3d at 211. “School officials must be able to show that their actions were caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.” AM. ex rel. McAllum v. Cash, 585 F.3d 214, 221 (5th Cir.2009) (alterations and internal quotation marks omitted). “Officials must base their decisions on fact, not intuition”, id. at 221-22 (internal quotation marks omitted); and *398 those decisions are entitled to deference, Shanley, 462 F.2d at 967 (“That courts should not interfere with the day-to-day operations of schools is a platitudinous but eminently sound maxim which this court has reaffirmed on many occasions.”). See also Wood, 420 U.S. at 326, 95 S.Ct. 992 (“It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.”).
As our court has held: “While school officials must offer facts to support their proscription of student speech, this is not a difficult burden, and their decisions will govern if they are within the range where reasonable minds will differ ”. Cash, 585 F.3d at 222 (emphasis added) (internal citations and quotation marks omitted). Accordingly, school authorities are not required expressly to forecast a “substantial or material disruption”; rather, courts determine the possibility of a reasonable forecast based on the facts in the record. See, e.g., id. at 217, 222; see also Tinker, 393 U.S. at 514, 89 S.Ct. 733 (“[T]he record does not demonstrate any •facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred”, (emphasis added)).
Factors considered by other courts in determining, pursuant to Tinker, the substantiality vel non of an actual disruption, and the objective reasonableness vel non of a forecasted substantial disruption, include: the nature and content of the speech, the objective and subjective seriousness of the speech, and the severity of the possible consequences should the speaker take action, e.g., Wynar, 728 F.3d at 1070-71; the relationship of the speech to the school, the intent of the speaker to disseminate, or keep private, the speech, and the nature, and severity, of the school’s response in disciplining the student, e.g., Doninger, 527 F.3d at 50-52; whether the speaker expressly identified an educator or student by name or reference, and past incidents arising out of similar speech, e.g., Kowalski, 652 F.3d at 574; the manner in which the speech reached the school community, e.g., Boim, 494 F.3d at 985; the intent of the school in disciplining the student, Snyder, 650 F.3d at 926, 929 (majority opinion), 951 (Fisher, J., dissenting); and the occurrence of other in-school disturbances, including administrative disturbances involving the speaker, such as “[sjchool officials ha[ving] to spend considerable time dealing with these concerns and ensuring that appropriate safety measures were in place”, D.J.M., 647 F.3d at 766, brought about “because of the need to manage” concerns over the speech, Doninger, 527 F.3d at 51.
ii.
Applying this precedent to the summary-judgment record at hand, and for the reasons that follow, a substantial disruption reasonably could have been forecast as a matter of law. Viewing the evidence in the requisite light most favorable to Bell, including his assertions that he wanted only to raise awareness of alleged misconduct by two teachers (Bell admitted at the disciplinary-committee hearing that his recording was meant to “increase awareness of the situation” and that he was “foreshadowing something that might happen” (emphasis added)), the manner in which he voiced his concern — with threatening, intimidating, and harassing language — must be taken seriously by school officials, and reasonably could be forecast by them to cause a substantial disruption.
The speech pertained directly to events occurring at school, identified the two *399 teachers by name, and was understood by one to threaten his safety and by neutral, third parties as threatening. (Bell agreed at the disciplinary-committee hearing that “certain statements” were made to his mother “outside the school setting” that “ ‘put a pistol down your mouth’[,] that is a direct threat”.) The possible consequences were grave — serious injury to, including the possible death of, two teachers. Along that line, Bell admitted he intended the speech to be public and to reach members of the school community, which is further evidenced by his posting the recording to Facebook and YouTube.
As noted, the school district’s Discipline — Administrative Policy lists “[hjarassment, intimidation, or threatening other students and/or teachers” as a severe disruption. Although we may not rely on ipse dixit in evaluating the school board’s actions, Shanley, 462 F.2d at 970, the school-district’s policy demonstrates an awareness of Tinker’s substantial-disruption standard, and the policy’s violation can be used as evidence supporting the reasonable forecast of a future substantial disruption. See, e.g., Morse, 551 U.S. at 408-10, 127 S.Ct. 2618 (relying on, inter alia, the student’s violation of established school policy in holding the school board did not violate the student’s First Amendment right); Fraser, 478 U.S. at 678, 686, 106 S.Ct. 3159 (noting that the “[tjhe school disciplinary rule proscribing ‘obscene’ language and the prespeech admonitions of teachers gave adequate warning to [the student] that his lewd speech could subject him to sanctions”).
Further, even after finding Bell threatened, intimidated, and harassed two teachers, the school board’s response was measured — temporarily suspending Bell and placing him in an alternative-education program for the remainder of the nine-week grading term (about six weeks). The reasonableness of, and amount of care given to, this decision is reinforced by the school board’s finding, differently from the disciplinary committee’s, that Bell’s statements also constituted threats.
And finally, numerous, recent examples of school violence exist in which students have signaled potential violence through speech, writings, or actions, and then carried out violence against school communities, after school administrators and parents failed to properly identify warning signs. See, e.g., Report of the Virginia Tech Review Panel, Mass Shootings at Virginia Tech April 16, 2007, 52 (August 2007), available at https://governor. virginia.gov/media/3772/fullreport.pdf (section entitled “Missing the Red Flags”); see also Ponce, 508 F.3d at 771 (“[T]he difficulty of identifying warning signs in the various instances of school shootings across the country is intrinsic to the harm itself’.); LaVine, 257 F.3d at 987 (“After Columbine, Thurston, Santee and other school shootings, questions have been asked how teachers or administrators could have missed telltale “warning signs,’ why something was not done earlier and what should be done to prevent such tragedies from happening again.”).
In determining objective reasonableness vel non for forecasting a substantial disruption, the summary-judgment record and numerous related factors must be considered against the backdrop of the mission of schools: to educate. It goes without saying that a teacher, which includes a coach, is the cornerstone of education. Without teaching, there can be little, if any, learning. Without learning, there can be little, if any, education. Without education, there can be little, if any, civilization.
It equally goes without saying that threatening, harassing, and intimidating a teacher impedes, if not destroys, the abili *400 ty to teach; it impedes, if not destroys, the ability to educate. It disrupts, if not destroys, the discipline necessary for an environment in which education can take place. In addition, it encourages and incites other students to engage in similar disruptive conduct. Moreover, it can even cause a teacher to leave that profession. In sum, it disrupts, if not destroys, the very mission for which schools exist — to educate.
If there is to be education, such conduct cannot be permitted. In that regard, the real tragedy in this instance is that a high-school student thought he could, with impunity, direct speech at the school community which threatens, harasses, and intimidates teachers and, as a result, objected to being disciplined.
Put succinctly, “with near-constant student access to social networking sites on and off campus, when offensive and malicious speech is directed at school officials and disseminated online to the student body, it is reasonable to anticipate an impact on the classroom environment”. Snyder, 650 F.3d at 951-52 (Fisher, J., dissenting). As stated, the school board reasonably could have forecast a substantial disruption at school, based on the threatening, intimidating, and harassing language in Bell’s rap recording.
B.
In considering Bell’s First Amendment claim, and our having affirmed summary judgment for the school board under Tinker, it is unnecessary to decide whether Bell’s speech also constitutes a “true threat” under Watts v. United, States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (holding hyperbolic threats on the President’s life are not “true threats”). See Elonis, 135 S.Ct. at 2012 (declining to address the First Amendment question (whether the speech was a “true threat” not protected by that amendment) after resolving the case on other grounds).
III.
For the foregoing reasons, the judgment is AFFIRMED.