# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 15, 2015

Lyle W. Cayce
Clerk

No. 13-60631

DONALD JACKSON, as Natural Parent and Next Friend on Behalf of a Minor; MELISSA JACKSON, as Natural Parent and Next Friend on Behalf of a Minor,

Plaintiffs - Appellees

v.

JOHN LADNER, Individually and as Superintendent of Pearl Public Schools; RAY MORGIGNO, Individually and as Principal of Pearl High School; TOMMIE HILL, Individually and in her capacity under Pearl High School; TIFFANY DURR, Individually and in her capacity under Pearl High School,

Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:09-CV-353

Before DENNIS and PRADO, Circuit Judges, and BROWN, District Judge.[*]

PER CURIAM:[**]

The plaintiffs-appellees, parents of M.J., a former Mississippi public high school student and cheer squad member, brought this suit pursuant to 42

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-60631

U.S.C. § 1983 on behalf of themselves and M.J. against teachers, a principal and the superintendent of the Pearl Public School District in Pearl, Mississippi, alleging violations of M.J.'s constitutional rights to privacy and freedom of speech. They allege that the violations occurred in September 2007 when Tommie Hill, a Pearl High School teacher and cheer squad sponsor, coercively requested M.J.'s Facebook log-in information and thereafter accessed M.J.'s Facebook messages to K.E., a senior student and a captain of the cheer squad. Hill took these actions based on reports she received from K.E. and other students that M.J. had cursed at and threatened K.E. on the bus ride returning from a cheer squad appearance at a local television station and that M.J. had continued to send K.E. threatening and imprecating Facebook messages afterwards. After inspecting the messages exchanged, Hill confirmed that the Facebook correspondence contained threatening and offensive language and concerned cheer squad activities. Accordingly, Hill suspended M.J. from cheer squad activities for two weeks and required K.E. to perform extra squad duties, including painting. M.J.'s parents asked the principal, Ray Morgigno, and the superintendent, John Ladner, to reverse Hill's disciplinary actions against M.J., but they refused. This litigation ensued. The defendants moved for summary judgment dismissing the claims on grounds of qualified immunity. The district court denied the defendants' motions and they appealed.

We reverse and remand the case for further proceedings. Although we express no opinion as to whether the school officials' conduct was constitutionally infirm, we conclude that the school officials are entitled to qualified immunity because it was not "clearly established" in September 2007 that it would violate either the First or Fourth Amendments for the teacher-sponsor, acting on reasonable suspicion that M.J. had made threatening and offensive remarks to K.E. during and immediately after a cheer squad event,

2

to demand access to M.J's Facebook messages and to temporarily suspend her from the squad based on her threatening and offensive remarks to K.E. related to cheer squad activities.

## I.

## A.

During the fall semester in September 2007, the Pearl High School cheer squad traveled to the WLBT television station in Jackson, Mississippi, and appeared on the local news to promote "Food for Families," a charitable cause. At the time, M.J.[1] was a freshman member of the cheer squad. During the filming at WLBT, a cameraman asked the squad to be quiet. M.J., however, continued to talk. K.E., in her role as captain of the cheer squad, remonstrated M.J.'s behavior and told her to be quiet. On the bus ride back to school, M.J. and K.E. exchanged unpleasantries.

The next day, cheer squad sponsor Tommie Hill[2] was informed that M.J. had threatened and cursed K.E. on the bus ride home from the television station. Later, K.E. informed Hill that M.J. continued to make threatening comments to her on the social-networking site Facebook.com. In response, Hill spoke to the entire cheer squad about the dangers of communicating on Facebook, including bullying, predatism, inappropriate photos, and other risks to young people. She also reminded them that the squad represented the school on and off campus. Hill then requested that the squad members provide her with their Facebook usernames and passwords so that she could inspect their Facebook accounts. According to the plaintiffs, Hill circulated a piece of paper at the squad meeting on which Hill instructed the members to write

---

[1] Because the students were minors at the time of the events in question, we use only their initials to protect their identity.

[2] Hill is also a teacher at Pearl High School.

down their Facebook usernames and passwords. In an affidavit, M.J. averred that "Ms. Hill did not give [the squad members] a choice of whether to supply [their] Facebook account information or not" and that because she "was taught to respect authority and do as teachers told [her] to do, [she] wrote [her] Facebook information on the notebook."

That evening, Hill checked the squad members' Facebook accounts, including the correspondence between M.J. and K.E. M.J.'s messages to K.E. included, but were not limited to, the following statements: "i am so sick of you bossing me around . . . and so is other people on the squad . . . even tho they wont admit it but im not scared to . . . and im sorry for wat i did at the news station well not really"; "i mean im not tryin to be mean at all but if i have a problem with you . . . i will confront you about it and im not gonna be nice about it . . . and trust me . . . i dont care who you try and get to try and back you up"; "trust me, the next time you or anyone else goes off on me . . . im not gonna be nice and just say ok, there will be problems . . . and i may get kicked off the squad for it but at least it was for a good reason cuz my parents didnt raise me to not stick up for myself . . . you best believe that i will stick up for myself with anyone!"[3] The time stamps on M.J.'s Facebook messages to K.E. indicate that they were sent after normal school hours, and M.J. avers that she never accessed her Facebook account from a school computer or on school property.

Based on the offensive and threatening language contained in these messages, Hill suspended M.J. from the cheer squad for two weeks, which resulted in M.J. being unable to participate in two pep rallies and one game night. However, according to M.J., she "was not allowed to participate in the majority of cheer practices" for the 2007-2008 school year. M.J. further avers that "[w]ith the exception of an approximately one week period[,] . . . [she] was

---

[3] The record also contains K.E.'s responses to M.J., but the content of K.E.'s responses is immaterial to our disposition of this appeal.

willing and able to participate in cheer practice and performance." In addition, M.J. claims that she "was forced to carry the personal effects and equipment of other cheerleaders"; was denied a participation ribbon at a cheer competition during the 2007-2008 school year; and that Hill publicly expressed her belief that M.J. should not receive a "spirit stick" despite being nominated for one by a fellow cheerleader. Hill, however, denies that M.J. was actually suspended from the squad for the balance of the school year; rather, she contends that M.J. declined to participate on the team due to an injury. Notably, M.J. does not claim that she was suspended from school, assigned to detention, or otherwise restricted from attending regularly scheduled classes. Rather, her allegations of punishment are limited to discipline affecting her participation on the cheer squad. Hill also punished K.E. by assigning her extra squad duties, including painting.

M.J.'s parents complained to Pearl High School Principal Ray Morgigno about Hill's conduct in accessing M.J.'s Facebook account and decision to temporarily suspend M.J. from the squad, but Morgigno allegedly refused to either reprimand Hill or reverse the punishment of M.J. The parents also complained to Pearl Public School District Superintendent Dr. John Ladner about Hill's and Morgigno's actions, but Ladner apparently also refused to modify M.J.'s punishment or to reprimand Hill or Morgigno.

M.J. was not invited to join the cheer squad for the following school year. According to Hill, M.J. "did not meet the tryout scoring requirements," which are "determined by set criteria and independent judges, who do not know these students in advance." M.J. also alleges that she was bullied by other students following Hill's access of her Facebook communications and the filing of this lawsuit; that school officials did not intervene to protect her; and that she suffered from anxiety and depression as a result of the treatment she received from students and staff. In December 2009, allegedly "due to the cruel

treatment [she] was receiving in the Pearl Public School District, [M.J.'s] family moved out of the . . . District."

## B.

On June 16, 2009, M.J.'s parents, individually and on behalf of M.J., filed suit in the United States District Court for the Southern District of Mississippi against Hill, Principal Morgigno, Superintendent Ladner, and Tiffany Durr, who allegedly was also a teacher and co-sponsor of the Pearl High School cheer squad.[4] Pertinent to this appeal,[5] plaintiffs alleged that the four defendants (1) violated M.J.'s right to privacy under the First and Ninth Amendments by accessing her private Facebook messages; and (2) violated M.J.'s right to free speech under the First and Ninth Amendments by punishing her for the content of her private Facebook messages.

Defendants moved for summary judgment dismissing plaintiffs' privacy and free-speech claims on the basis of qualified immunity,[6] which the district

---

[4] The complaint also named the Mississippi Cheerleading Academy, LLC, school official Cory Byrd, and various John Does, but those defendants were dismissed and are not parties to this appeal.

[5] Plaintiffs also claimed that defendants violated M.J.'s constitutional rights to free association and due process, and that defendants' conduct constituted cruel and unusual punishment. Plaintiffs also asserted state law claims for intentional infliction of emotional distress, defamation of character, and civil conspiracy. Plaintiffs subsequently abandoned their due process and civil conspiracy claims in the district court. With the exception of the free speech and constitutional privacy claims addressed herein, all remaining claims were thereafter dismissed by the district court.

[6] Defendants first filed a document confusingly titled "Motion for Qualified Immunity," which the district court docketed as a motion to dismiss. However, in their memorandum in support of that motion, defendants recited the applicable standard of review for a motion for summary judgment. More critically, defendants also attached to that memorandum various exhibits under seal, including an affidavit from Hill and print-outs of the Facebook correspondence between M.J. and K.E. Further, on appeal, defendants repeatedly characterize their unsuccessful Motion for Qualified Immunity as a motion for summary judgment, and plaintiffs do not challenge that characterization. In light of the foregoing, although the district court orally referred to defendants' Motion for Qualified Immunity as a motion to dismiss during the hearing on that motion, we will construe the motion as one for summary judgment. Our conclusion in this regard is further buttressed by

court denied.[7] The district court reasoned that the plaintiffs' privacy and free-speech claims were both grounded in "clearly established" law. Further, in addition to concluding that plaintiffs' claims were premised upon clearly established law, the district court also concluded that disputed questions of fact remained, namely whether M.J. voluntarily provided Hill with her Facebook log-in information and also the extent of punishment that M.J. actually received as a result of her Facebook communications with K.E. This interlocutory appeal followed.[8]

On appeal, defendants argue that the district court erroneously denied their motion for summary judgment on the basis of qualified immunity.

## II.

We have jurisdiction over the district court's denial of defendants' motion for summary judgment on the basis of qualified immunity only "to the extent that the appeal turns on a question of law." *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007); *see also Ortiz v. Jordan*, 562 U.S. 180, 188 (2011). Although we lack jurisdiction to review the court's determination that a genuine fact issue exists, we can nevertheless "review whether any factual dispute found by the district court is material for summary judgment purposes;

---

the fact that it is clear from a review of the relevant hearing transcript that the district court considered in its ruling the exhibits attached to defendants' motion. *See Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004) ("If the district court considers information outside of the pleadings, the court must treat the motion [to dismiss] as a motion for summary judgment.").

[7] The district court orally announced its ruling and articulated its reasoning at a telephonic conference held on the motion.

[8] Prior to filing their notice of appeal, defendants filed a Motion for Reconsideration. After the filing of the notice of appeal to this court, the district court granted in part and denied in part the defendants' motion. The district court's order would dismiss all claims against Durr and the privacy claims against Morgigno and Ladner. However, because we resolve this case on other grounds, we need not consider the effect of the district court's Order on the defendants' Motion for Reconsideration. *Cf.* FED. R. APP. P. 12.1.

that is, the court can consider the legal sufficiency of the facts that the district court found to be supported by the summary judgment record." *Freeman*, 483 F.3d at 410. Further, "[t]he scope of clearly established law and the objective reasonableness of those acts of the defendant that the district court found the plaintiff could prove at trial are legal issues we review *de novo*." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 456 (5th Cir. 2001).

In the instant case, the district court made two rulings, one of which is immediately appealable under the foregoing principles. The district court held, *first*, that plaintiffs' complaint stated a claim for the violation of M.J.'s "clearly established" constitutional rights to free speech under the First Amendment and to be free from unreasonable searches and seizures under the Fourth Amendment; and *second*, that genuine issues of fact remained for trial with respect to the voluntariness of M.J.'s consent for Hill to access her private Facebook account, and with respect to what type and measure of punishment that M.J. was subjected as a result of her allegedly inappropriate Facebook communications with K.E. Only the first constitutional holdings involve "a 'purely legal issue,'" *viz.*, "the determination of what law was 'clearly established' at the time the defendant acted." *Ortiz*, 562 U.S. at 188 (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). Accordingly, the defendants may immediately appeal the order premised upon those holdings and we therefore will limit our review to considering whether the defendants violated law that was "clearly established" at the time the events giving rise to this appeal took place. *See Mitchell v. Forsyth*, 472 U.S. 511, 528–29 (1985).

**III.**

Qualified immunity shields federal and state officials from money damages unless a plaintiff shows (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct.

No. 13-60631

2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court recently reaffirmed that lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A case directly on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* As explained herein, the two constitutional questions in this case fall short of that threshold.

## A.

First, plaintiffs contend that M.J.'s constitutional right to privacy[9] was violated when Hill obtained M.J.'s Facebook log-in information, subsequently searched her account, and then disseminated the content of her messages with K.E to other school officials. In evaluating this claim, we will take "as given" that M.J. did not consent to the search of her Facebook profile. *See Johnson*, 515 U.S. at 319 ("When faced with an argument that the district court

---

[9] In their complaint, plaintiffs asserted a claim for the violation of M.J.'s right to privacy under the First, Ninth, and Tenth Amendments. However, as the district court's order and the parties' briefing make clear, plaintiffs are in effect alleging a violation of M.J.'s reasonable expectation of privacy guaranteed by the Fourth Amendment. Because the Fourth Amendment more squarely governs the claim plaintiffs assert, we analyze M.J.'s privacy claim under the relevant Fourth Amendment standards. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 394–95 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against . . . physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."); *Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005) (citing *Graham v. Connor* for the proposition that "constitutional claims must be addressed under the most applicable provision").

mistakenly identified clearly established law, the court of appeals can simply take, as given, the facts that the district court assumed when it denied summary judgment for that (purely legal) reason.").

In *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), the Supreme Court established a two-step inquiry for determining the reasonableness of a school official's decision to search a student.  First, the Court explained, the search must be "'justified at its inception'" by the presence of "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 342.  Second, the search must be "permissible in its scope," which is achieved "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*  However, although these constitutional principles are now well-settled, this does not end our inquiry into whether the defendants in the instant case violated "clearly established" Fourth Amendment law.  Rather, in determining whether a right was "clearly established" at the time of an official action, we must look at the right violated in a "particularized sense," rather than "at a high level of generality." *See Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004) (per curiam).  As the Supreme Court recently has emphasized, however, "there is no need that 'the very action in question [have] previously been held unlawful.'" *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009) (modification in original) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).  Outrageous conduct obviously will be unconstitutional. *Id.*  "But even as to action less than an outrage, 'officials can still be on notice that their conduct violates established law . . . in novel factual circumstances.'" *Id.* at 377–78 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  The salient question therefore is whether the defendants here had "fair warning" that their conduct violated the Fourth Amendment, *Hope*, 536

U.S. at 739–40, meaning that the unlawfulness of their actions must be "apparent" in light of pre-existing law, *Anderson*, 483 U.S. at 640. The ultimate focus of our inquiry must be the "objective legal reasonableness" of the defendants' actions assessed in light of the "clearly established" law at the time of the events in question. *See Wilson*, 526 U.S. at 614 (internal quotation marks omitted).

Applying these principles to the instant case, we are compelled to conclude that the defendants are entitled to qualified immunity on plaintiffs' Fourth Amendment claim. At the time Hill requested and obtained access to M.J.'s Facebook messages—in September 2007—no precedent had held that the Fourth Amendment proscribed Hill's actions, *viz.*, the search of a student's electronic communications pertaining to school activities based on a reasonable belief that those communications directed threats and offensive language to another student about school activities and where those communications were a continuation of a quarrel that began during a school-related activity. To the contrary, as explained above, the Supreme Court's 1985 decision in *T.L.O.* held that a public school official ordinarily may search a student (and in the circumstances of that case, the student's purse) if, at the inception of the search, the official has a reasonable suspicion "that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." 469 U.S. at 341–42. The Court qualified that rule by stating that "[s]uch a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342. It was not until 2009 that the Court clearly established that the Fourth Amendment prohibited the strip search of a 13-year-old female student upon reasonable suspicion that she had brought forbidden prescription and over-the-counter medications to school. *Redding*,

11

557 U.S. at 368. However, in light of the uncertainty about the scope of schools' authority to conduct strip searches pursuant to *T.L.O.*, the Court in *Redding* granted qualified immunity to the school officials notwithstanding the fact that the strip search in that case violated the Fourth Amendment. *Id.* at 378–79.

Similar reasoning compels the grant of qualified immunity here. The undisputed evidence shows that M.J. and K.E.'s quarrel arose in connection with the cheer squad's visit to WLBT and continued on the bus ride back to school from the station. Thereafter, during non-school hours, M.J. sent K.E. the online messages that prompted K.E. to complain to Hill that M.J. had made threats and offensive remarks to her via Facebook. Based on K.E.'s allegations, Hill requested access to M.J.'s Facebook account and then read the messages between M.J. and K.E. Although the plaintiffs contest the characterization of M.J.'s messages as threatening, the plaintiffs have cited to no record evidence to contradict the summary-judgment evidence presented by defendants reflecting that Hill was *informed* that M.J. had threatened and cursed at K.E. on the return school-bus ride from WLBT. Nor have plaintiffs offered evidence contradicting the fact that Hill was informed by K.E. that M.J. had continued making these threatening remarks related to cheer squad activities on Facebook. In light of these unique facts and the dearth of pertinent case law, we conclude that school officials acting in 2007 did not have fair warning that they could not, consistent with the Fourth Amendment, access a student's social-networking account upon receiving information that the student had sent threatening online messages to another student, where those remarks concerned school activities and where the quarrel began at a school-related function. *See Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 618 (5th Cir. 2004) ("Qualified immunity should be recognized if officials of reasonable competence could disagree on whether a particular action is unlawful.") (internal quotation marks omitted). In other words, whether or not

No. 13-60631

the individual defendants' conduct here violated M.J.'s right to privacy, that Fourth Amendment right nevertheless was not "clearly established" in these unique factual circumstances at the time defendants acted. *See al-Kidd*, 131 S. Ct. at 2083 (observing that a constitutional right is "clearly established" when "existing precedent . . . [has] placed the . . . constitutional question beyond debate"). Accordingly, while we express no opinion regarding whether the individual defendants' conduct violated the Fourth Amendment, we conclude that the defendants are nevertheless entitled to qualified immunity with respect to M.J.'s constitutional privacy claim because the right asserted by plaintiffs was not "clearly established" as of September 2007 in light of the particular facts of this case. *See, e.g.*, *Redding*, 557 U.S. at 368. The district court therefore erred in denying the defendants qualified immunity with respect to this claim.

**B.**

The defendants further contend that the district court erred in denying them qualified immunity with respect to M.J.'s First Amendment free-speech claim. In evaluating whether the defendants' conduct violated M.J.'s "clearly established" First Amendment rights, we will take "as given" M.J.'s contention that she was punished for the content of her online messages by, *inter alia*, being suspended from the cheer squad for the balance of the school year. *See Johnson*, 515 U.S. at 319.

It is axiomatic that "the First Amendment prohibits not only direct limitations on speech but also adverse government action against an individual because of her exercise of First Amendment freedoms." *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999). Further, it can hardly be disputed that Internet speech was protected by the First Amendment at the time the events in this case occurred. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 672–73 (2004); *Reno v. ACLU*, 521 U.S. 844, 868–69 (1997). It has likewise long been

13

established that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

However, while these general First Amendment principles were firmly established in 2007, this is not dispositive of our inquiry into whether M.J.'s First Amendment rights were "clearly established" at the time of defendants' conduct given the unique facts of this case. *See, e.g., Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004). Rather, consistent with our preceding Fourth Amendment analysis, we also must determine whether or not it "would be clear" to a reasonable school official in the defendants' position that punishing M.J. for the content of her Facebook messages would violate the First Amendment given the particular circumstances here. *See Porter*, 393 F.3d at 620 (granting qualified immunity to school official on plaintiff's First Amendment claim where it would not "be clear to a reasonable [school] official that sanctioning [plaintiff] based on the content of his [speech] was unlawful under the circumstances"). We agree with defendants that the answer is no.

At the time of the events in question, insufficient precedent existed to provide school officials with "fair warning" that the defendants' conduct violated the First Amendment. *See Bush v. Strain*, 513 F.3d 492, 501–02 (5th Cir. 2008) (observing that the "central concept" of qualified immunity is that of "fair warning"). Indeed, less than three years prior to the defendants' conduct in the instant case, our own court observed that First Amendment case law did not provide "clear guidance" and had sent "inconsistent signals" with regard to "how far school authority to regulate student speech reaches beyond the confines of the campus." *Porter*, 393 F.3d at 620. Further, while the speech at issue in *Porter* occurred entirely outside the school environment,[10] the off-

---

[10] The drawing at issue in *Porter* "was composed off-campus, displayed only to members of [the student's] own household, stored off-campus, and not purposely taken by

No. 13-60631

campus speech at issue here arose during and in the course of school-related activities and was a continuation of a quarrel that began on the bus ride home from a school-related event. Moreover, unlike in *Porter*, the undisputed summary-judgment evidence shows that M.J. was not suspended *from school* on the basis of her speech but rather suspended from her participation on the cheer squad. Our careful review of relevant case law has uncovered no intervening precedent between *Porter* and the underlying events here that would provide "every reasonable [school] official" with sufficient notice that the defendants' actions violated the First Amendment. *See Al-Kidd*, 131 S. Ct. at 2083. Thus, while we express no opinion as to whether the defendants' conduct conflicted with the First Amendment, we nevertheless conclude that the district court erred in denying the defendants qualified immunity on M.J.'s free-speech claim given the unique factual circumstances of this case.

## IV.

For these reasons, the district court's order denying qualified immunity is REVERSED. The case is therefore REMANDED for proceedings consistent with this opinion.

---

him to [school] or publicized in a way certain to result in its appearance at [school]." 393 F.3d at 620.