# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-41060

United States Court of Appeals
Fifth Circuit

**FILED**

November 4, 2019

Lyle W. Cayce
Clerk

ZULEMA LONGORIA, As Next Friend of M.L.,

Plaintiff - Appellant Cross-Appellee

v.

SAN BENITO INDEPENDENT CONSOLIDATED SCHOOL DISTRICT;
HENRY SANCHEZ; ADRIAN VEGA; ASHLEY CAMACHO-GARZA; VELMA
GARCIA,

Defendants - Appellees Cross-Appellants

Appeals from the United States District Court
for the Southern District of Texas

Before KING, HIGGINSON, and DUNCAN, Circuit Judges.
STEPHEN A. HIGGINSON, Circuit Judge:

A few weeks after she was selected to be the head varsity cheerleader at
San Benito High School, M.L., a minor, was stripped of her position and
dismissed from the team when her cheerleading coaches discovered a series of
posts on her personal Twitter account containing profanity and sexual
innuendo. M.L.'s mother, Zulema Longoria, filed this lawsuit on behalf of her
daughter under 42 U.S.C. § 1983. She argues that the actions of the school
district, its superintendent, the high school principal, and the cheerleading
coaches violated M.L.'s rights to free speech, due process, and equal protection.
After the defendants moved for dismissal under Federal Rule of Civil

No. 18-41060

Procedure 12(b)(6), the district court held that the individual defendants were entitled to qualified immunity and dismissed M.L.'s complaint for failure to state a claim.

Because we agree that no clearly-established law placed the constitutionality of defendants' conduct "beyond debate" at the time of M.L.'s dismissal from the team, *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), we affirm the district court's qualified-immunity holding. We likewise affirm the district court's dismissal of M.L.'s claims for municipal liability, vagueness, and overbreadth because M.L. failed to plead facts that would entitle her to relief.

I.

M.L. joined the varsity cheerleading team during her sophomore year at San Benito High School. In March 2017, she became the head varsity cheerleader of the team, a position she was supposed to hold for the remainder of that year and the following school year. As part of her participation on the team, M.L. and her mother were both required to sign the San Benito High School Cheerleading Constitution ("the Cheerleading Constitution"). Section 5.12 of the Cheerleading Constitution requires cheerleaders to maintain "appropriate" conduct on their personal social-media accounts.

Shortly after she was named head cheerleader, M.L. and her mother were called into a meeting with Ashley Camacho-Garza and Velma Garcia, the two coaches of the cheerleading team. When they arrived, they were given a letter explaining that M.L. was being dismissed from the team because she had accumulated a number of demerits for posting material on her Twitter account

No. 18-41060

in violation of the Cheerleading Constitution.[1] M.L. alleges that this was the first time she was informed that the coaches were concerned about her social-media activity, and she received no prior notice about the demerits.

Eight of the posts identified by Camacho-Garza and Garcia were third-party messages created by other Twitter users. Using her own account, M.L. "liked" these posts, causing them to be shared with her social-media followers. The relevant posts include the following messages: (1) "Imma show my mom all the snaps[2] from girls partying for spring break so she can appreciate her lame ass daughter some more," (2) a tweet about braiding hair containing the acronym "lmao,"[3] (3) a tweet containing an image of a text-message conversation between a mother and a daughter, in which the word "fuck" is used twice, (4) "I love kissing lmao," (5) "i [sic] don't fuck with people who lowkey try to compete with/ out do me," (6) "I fucking love texas [sic] man, it's so beautiful and just overall great! Why would anyone want to leave Texas[?]," (7) "I love her [third-party Twitter user] I FUCKING LOVE YOU SO MUCH AND YOU DONT [sic] EVEN KNOW IT LIKE BITCH I HOPE YOU DO GREAT SHIT IN LIFE I BELIEVE IN YOU," and (8) a tweet from a Twitter account entitled "Horny Facts™," which states, "bitch don't touch my . . ."[4]

The record contains two other posts allegedly deemed inappropriate by M.L.'s coaches. One, a third-party tweet that M.L. retweeted on her own account, was initially posted by a Twitter user called "Bitch Code." The second is M.L.'s own tweet responding "Yes" to a third-party user's message asking

---

[1] Article XI of the Cheerleading Constitution explains that "[a]ny member receiving 10 demerits will be dismissed immediately from the team."

[2] The term "snaps" refers to messages sent through Snapchat, a social-media platform used for sharing videos and images.

[3] The acronym "lmao" stands for "laughing my ass off."

[4] The eighth tweet contained an image that is indiscernible in the record. There is no indication the defendants took issue with the contents of this image.

"Did pope split you in half??"[5] In the biography section at the top of M.L.'s Twitter account, she identified herself as a member of "San Benito Varsity Cheer."

M.L. and her mother filed a grievance against the coaches' actions with Henry Sanchez, the principal of San Benito High School. They complained that the Cheerleading Constitution was impermissibly vague as to the social-media content that would be considered "inappropriate" and subject to discipline, and they argued that M.L.'s dismissal from the team violated her right to free speech. In April 2017, Sanchez denied the grievance in a written ruling following a hearing. M.L. and her mother met with Dr. Adrian Vega, the superintendent of the San Benito Independent Consolidated School District, to raise their concerns. A few days later, Dr. Vega informed them that Principal Sanchez's ruling was final and would not be reviewed.[6]

M.L. and Zulema Longoria ("plaintiffs" or "M.L.") filed this lawsuit in the Southern District of Texas against Camacho-Garza, Garcia, Sanchez, Vega, and the school district in August 2017. On July 31, 2018, the magistrate judge issued a report and recommendation recommending dismissal of the complaint in its entirety. Though the magistrate judge's report concluded that the complaint plausibly alleged a violation of M.L.'s First Amendment rights, it found that there was no clearly-established law prohibiting the defendants from dismissing M.L. from the cheerleading team for online profanity and sexual innuendo. It based its conclusion, in part, on two specific facts: "(1) the

---

[5] M.L. provided the district court with an entry from "Urban Dictionary," which explained that the phrase "split [a person] in half" is a sexual innuendo.

[6] M.L. was apparently allowed to rejoin the cheerleading team for the 2018–2019 school year and was selected to serve as co-captain of the team during that school year. Nevertheless, because she and her mother seek money damages for the alleged constitutional violations, this case is not moot. *See, e.g.*, *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 286 (5th Cir. 2012).

student and her mother had agreed in writing that her social media page would be subject to the reach of the Cheerleading Constitution, and (2) the biography section of M.L.'s Twitter profile identified her as part of 'San Benito Varsity Cheer.'" As a result, the magistrate judge recommended granting the individual defendants' qualified-immunity defenses. The magistrate judge also recommended dismissing plaintiffs' vagueness and overbreadth claims because these claims were raised for the first time in response to defendants' motion to dismiss, and had not been asserted in the complaint. Finally, the magistrate judge recommended dismissal of the plaintiffs' claim against the school district because the complaint did not adequately plead that the district's Board of Trustees had either adopted the Cheerleading Constitution on its own or delegated policymaking authority to Sanchez.

The district court adopted the report and recommendation over plaintiffs' objections and granted the defendants' motion to dismiss the complaint. On appeal, M.L. challenges the district court's conclusions that the individual defendants were entitled to qualified immunity and that M.L. failed to state a claim for vagueness, overbreadth, or municipal-liability.[7]

## II.

We "review a district court's grant of a motion to dismiss de novo, applying the same standard applied by the district court." *Masel v. Villarreal*, 924 F.3d 734, 742–43 (5th Cir. 2019). "To survive a motion to dismiss 'a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Id.* at 743 (quoting *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019)). In conducting this analysis, we

---

[7] M.L. does not appeal the district court's dismissal of her equal protection claim, nor does she appeal the district court's holding that she failed to allege specific conduct by Superintendent Vega that allegedly caused her constitutional injuries.

"accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiffs." *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012). Though the complaint need not contain "detailed factual allegations," it must contain sufficient factual material to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

When a defendant asserts a qualified-immunity defense in a motion to dismiss, the court has an "obligation . . . to carefully scrutinize [the complaint] before subjecting public officials to the burdens of broad-reaching discovery." *Jacquez v. Procunier*, 801 F.2d 789, 791 (5th Cir. 1986); *see also Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 995 n.16 (5th Cir. 1995) ("[I]mmunity means more than just immunity from liability; it means immunity from the burdens of defending a suit, including the burdens of pretrial discovery."). A defendant is entitled to qualified immunity if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "This is not to say that an official action is protected by qualified immunity unless the very act in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 618 (5th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). If, at the time of the events underlying the litigation, "insufficient precedent existed to provide school officials with 'fair warning' that the defendants' conduct violated the First Amendment," the defendants are entitled to qualified immunity. *Jackson v. Ladner*, 626 F. App'x 80, 88 (5th Cir. 2015) (quoting *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)).

No. 18-41060

III.

M.L. argues that the defendants violated her First Amendment rights when they dismissed her from the cheerleading team as a punishment for her social-media activity. She argues that her off-campus Twitter posts, which were not threatening or directed towards the school community, did not come within the disciplinary reach of school officials.  The district court agreed that the complaint stated a "legally sufficient First Amendment claim against [the] Individual Defendants," but it held that there was no clearly-established law that would have made it obvious to the defendants that extracurricular discipline was subject to the same level of constitutional protection as other forms of school-based discipline. As a result, the court granted qualified immunity to the individual defendants.

In reaching its conclusion, the district court followed the traditional two-step approach to qualified immunity. First, it determined that the facts alleged by M.L. stated a claim for the violation of a constitutional right. Then, it analyzed whether the right at issue was clearly established at the time of the defendants' actions. This two-step inquiry, however, is not mandatory. Since the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand," *id.* at 236. If the court determines that the right asserted by the plaintiff was not clearly established, it need not reach the more difficult constitutional question. *Camreta v. Greene*, 563 U.S. 692, 707 (2011); *see also Morgan v. Swanson*, 659 F.3d 359, 384 (5th Cir. 2011) ("Because we have granted immunity to the [defendants] at step two of the qualified-immunity analysis, it is within our discretion to decline entirely to address the constitutionality of the defendants' conduct."). Indeed, the Supreme Court has "detailed a range of circumstances in which courts should address only the

immunity question," and has admonished courts to "think hard, and then think hard again, before turning small cases into large ones" by engaging in unnecessary constitutional analysis. *Camreta*, 563 U.S. at 707.

We therefore turn to the second prong of the qualified-immunity analysis and find that, regardless of whether M.L.'s rights were violated, the right at issue was not clearly established. *See Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998) ("[T]his court may affirm a judgment upon any basis supported by the record."). Nevertheless, though we do not reach the first prong, we are mindful of the pressing "need to provide clear guidance for students, teachers, and school administrators that balances students' First Amendment rights . . . with the vital need to foster a school environment conducive to learning." *Bell v. Itawamba County Sch. Bd.*, 799 F.3d 379, 403 (5th Cir. 2015) (Costa, J., concurring). Given the ubiquity of social media and the permeable boundaries between on-campus and off-campus speech, this task is complicated but increasingly urgent. We thus conclude by articulating limitations derived from our existing precedent for school discipline of student off-campus speech.

A.

In 1969, the Supreme Court famously declared that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 506 (1969). Still, while the First Amendment's protections apply to the school environment, "those rights must be tempered in the light of a school official's duty to, *inter alia*, 'teach[] students the boundaries of socially appropriate behavior' and 'protect those entrusted to their care.'" *Bell*, 799 F.3d 379, 389-90 (first quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986); then quoting *Morse v. Frederick*, 551 U.S. 393, 408 (2007)). When determining the contours of a student's free speech rights, we must keep in mind the "special characteristics of the school environment," acknowledging that "the

constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Morse*, 551 U.S. at 396–97 (quoting *Fraser*, 478 U.S. at 682)).

The Supreme Court first addressed the limits of school discipline of student expression in *Tinker*. In evaluating the constitutionality of the school district's suspension of students for wearing black armbands to protest the Vietnam War, the Court balanced the need to maintain school order and promote a safe learning environment against the students' right to express their opinions. 393 U.S. at 740–41. The Court held that the students' speech, which neither "interrupted school activities nor . . . intrude[d] in the school affairs or the lives of others," was protected by the First Amendment. *Id.* at 740. Only where a student's speech actually causes or reasonably might be projected to cause a "substantial disruption of or material interference with school activities" may a school impose discipline for student speech. *Id.*; *see also Bell*, 799 F.3d at 390 (observing that the *Tinker* standard may be satisfied "either by showing a disruption has occurred, or by showing 'demonstrable factors that would give rise to any reasonable forecast by the school administration of 'substantial and material' disruption" (emphasis omitted) (quoting *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 974 (5th Cir. 1972)).

Since *Tinker*, the Court has considered the reach of the First Amendment in schools on three occasions. In each of these cases, the Court articulated a "narrow exception[] to the general *Tinker* standard based on certain characteristics, or content, of the speech." *Bell*, 799 F.3d at 390. First, in *Fraser*, the Court held that a school was constitutionally permitted to discipline a student for utilizing vulgar and offensive terms and sexual innuendo during an on-campus event. *Fraser*, 478 U.S. at 683. The Court noted that the student's speech took place during an "official high school assembly attended by 600 students," and held that it was an appropriate function of a

school to "prohibit the use of vulgar and offensive terms in public discourse." *Id* at 681; *see also id.* at 683 ("The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board."). In *Hazelwood v. Kuhlmeier*, 484 U.S. 260 (1988), the Court upheld the right of a school district to "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. And finally, in *Morse v. Frederick*, 551 U.S. 393 (2007), the Court held that a school official may suppress speech conducted during a school-sponsored event that "promote[s] illegal drug use." *Id.* at 410.

Notably, each of these cases represents an exception to the substantial-disturbance test articulated in *Tinker*. In affirming the schools' right to discipline the speech at issue in those cases, the Court did not require the school officials to forecast a substantial disruption to the classroom environment or other school activities. Instead, the Court held that the district could discipline the students because of the "special features of the school environment" and the particularly harmful aspects of the speech at issue in each case. *Bell*, 799 F.3d at 392 (quoting *Morse*, 551 U.S. at 425 (Alito, J., concurring)).

Recognizing that *Fraser*, *Hazelwood*, and *Morse* exemplify three narrow exceptions to the *Tinker* standard, we held in *Bell* that "threats against, and harassment and intimidation of, teachers" must be analyzed under the *Tinker* rule. 799 F.3d at 392.[8] In *Bell*, a high school student posted a rap recording to

---

[8] In *Ponce v. Socorro Independent School District*, 508 F.3d 765 (5th Cir. 2007), we applied the reasoning of *Morse* to a case involving a student's threats of a "mass, systematic" school shooting. *Id.* at 771. We allowed the school district to discipline the speech in *Ponce* because threats of widespread violence, like advocacy of illegal drug use, "gravely and uniquely" jeopardize the safety of the entire school community. *Id.* at 771–72 ("If school administrators are permitted to prohibit student speech that advocates illegal drug use

his personal Facebook page, and later to YouTube, while he was "[a]way from school or a school function and without using school resources." *Id.* at 383. The recording contained threatening, profane, and intimidating language directed towards two teachers, accusing them of sexually harassing students at the high school. *Id.* at 384; *see also id.* at 403–04 (Dennis, J., dissenting). When the school became aware of the recording, Bell was suspended. *Id.* at 385. On appeal, we upheld the district's disciplinary actions. *Id.* at 394. Though Bell's speech was conducted off-campus, it was "intentionally direct[ed] at the school community," and the speech could reasonably be understood "by school officials to threaten, harass, and intimate a teacher." *Id.*at 396. These unique features of the speech in *Bell* allowed the school to reasonably forecast "a substantial disruption," justifying school discipline. *Id.* at 398.

M.L. argues that *Bell* squarely applies to this case. She asserts that *Bell* "made it abundantly clear that intent to reach the school community is the most important factor when deciding if *Tinker* applies to off-campus online speech." Because M.L. did not intend her tweets to reach the school, she argues, *Tinker* did not apply to her off-campus speech, and therefore the defendants were not permitted to dismiss her from the team.

*Bell*, however, did not articulate a generally-applicable standard for the discipline of *all* off-campus speech, including the tweets here. To the contrary, we noted in *Bell* that we were declining to adopt a "specific rule" that would apply to all circumstances under which off-campus speech may be restricted.

---

because illegal drug use presents a grave and in many ways unique threat to the physical safety of students, then it defies logical extrapolation to hold school administrators to a stricter standard with respect to speech that gravely and uniquely threatens violence, including massive deaths, to the school population as a whole." (internal quotation marks and citation omitted)). We have thus applied the limited exception in *Morse* to a circumstance distinct from the drug-related speech in that case. Neither party suggests, however, that the *Morse* standard applies to the lewd speech at issue here.

*Id.* at 394. Instead, we limited ourselves to the facts of the case before us, observing only that "Bell's admittedly intentionally directing at the school community his rap recording containing threats to, and harassment and intimidation of, two teachers permits *Tinker*'s application in this instance." *Id.*; *see also id.* at 401–02 (Elrod and Jones, JJ., concurring). In deciding only the case before us, we did not model our decision on the Third Circuit's approach to off-campus student speech. That circuit, in a pair of en banc cases decided the same day, decisively held that a school may not discipline a student for "off-campus speech that is not school-sponsored or at a school-sponsored event and that caused no substantial disruption at school," *J.S. ex rel. Snyder v. Blue Mountain School District*, 650 F.3d 915, 933 (3d Cir. 2011); *Layshock ex rel. Layshock v. Hermitage School District*, 650 F.3d 206, 207 (3d Cir. 2011) (holding that "the First Amendment prohibits [a] school from reaching beyond the schoolyard" to discipline "expressive conduct that originated outside of the schoolhouse, did not disturb the school environment and was not related to any school sponsored event"). Because *Bell*, in contrast to the Third Circuit, did not articulate a generalized rule that could have applied to M.L.'s speech, it does not constitute clearly-established binding law that should have placed the defendants on notice about the constitutionality of their actions.

Our decisions in two other cases help to underscore the fact that much of our law on the boundaries of off-campus speech remained unclear at the time that M.L. was dismissed from the cheerleading team. In *Porter v. Ascension Parish School Board*, 393 F.3d 608 (5th Cir. 2004), we granted qualified immunity to a school official after a student's sketch depicting a "violent siege" on his high school community was inadvertently brought to school by his younger brother. *Id.* at 611, 620. We noted that the contours of the First Amendment "as applied to off-campus student speech inadvertently brought on campus by others" was "unsettled." *Id.* at 620. Because of the uncertainty

in the law and the lack of clear precedent that could have guided official conduct, we held that the school official's actions were reasonable. *Id.* at 621. Since *Porter*, our cases have failed to clarify the law governing school officials' actions in disciplining off-campus speech. In *Jackson v. Ladner*, 626 F. App'x 80 (5th Cir. 2015), a case applying pre-*Bell* authority, we granted qualified immunity to a school official who suspended a cheerleader from the cheer squad based on messages she sent to another member of the team on Facebook. *Id.* at 81, 88–89. We noted that our cases "had sent 'inconsistent signals' with regard to 'how far school authority to regulate student speech reaches beyond the confines of the campus,'" and therefore failed to provide school officials with "fair warning" about the boundaries of on-campus speech. *Id.* at 88–89 (quoting *Porter*, 393 F.3d at 620). Given these cases, we cannot say that our precedent clearly established rules governing defendants' actions.[9]

M.L. argues that the Supreme Court's own cases clearly established the unconstitutionality of the defendants' actions. She notes that in *Morse*, the Court distinguished between the permissible discipline of on-campus lewd speech in *Fraser* and the broader protection of similar speech conducted in a public forum. *See Morse*, 551 U.S. at 405 ("Had Fraser delivered the same speech in a public forum outside the school context, he would have been protected."). M.L. relies on negative inferences from each of the Supreme Court's cases—the assumption that any speech that does not match the unique

---

[9] Nor is there robust persuasive authority from other circuits that clearly established the conditions that would justify school discipline of off-campus speech. The Third Circuit's decisions in *Layshock* and *Snyder* most closely resemble the facts of this case because they also involved online lewd speech, but the Second Circuit in *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008), declined to "conclusively determine *Fraser*'s scope," thus leaving open the question of when and whether a school can discipline off-campus vulgarity. *Id.* at 49; *see also Wynar v. Douglas County School District*, 728 F.3d 1062, 1067 (9th Cir. 2013) (observing that, beyond the four Supreme Court cases involving school-based speech, "[t]here is some uncertainty at the outer boundaries as to when courts should apply school speech precedents" (alteration in original) (quoting *Morse*, 551 U.S. at 401)).

characteristics of the speech in those cases is entitled to full First Amendment protection. Though "[w]e do not require a case directly on point" to defeat a qualified-immunity defense, a school official is entitled to immunity from suit unless "existing precedent . . . placed the statutory or constitutional question *beyond debate*." *Al-Kidd*, 563 U.S. at 741 (emphasis added); *see also Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019) ("[C]learly established law comes from holdings, not dicta."). The Court's four school speech cases, including *Morse*, all pertain to on-campus speech or speech conducted during a school-sponsored activity. Because the Court has not had the occasion to articulate a rule that sets forth the limits of school discipline of off-campus speech, its cases did not clearly establish the contours of M.L.'s rights in light of the specific facts of this case. *See, e.g.*, *Brown v. Miller*, 519 F.3d 231, 236–37 (5th Cir 2008); *Doninger*, 527 F.3d at 48 ("The Supreme Court has yet to speak on the scope of a school's authority to regulate expression that . . . does not occur on school grounds or at a school-sponsored event.").

Indeed, there are a number of unique circumstances present here that set this case apart from *Bell* and the Supreme Court's precedent. M.L. and her mother both signed the Cheerleading Constitution, which put them on notice that M.L.'s social-media activity could be monitored and penalized. M.L. identified herself as a member of the San Benito cheerleading team on her Twitter page. And perhaps most notably, M.L. was dismissed from an *extracurricular activity* as a consequence of her speech—not suspended from school altogether. The fact that the retaliatory action here involved an extracurricular sanction further distinguishes this case from our precedent. *See Jackson*, 626 F. App'x at 89 (granting qualified immunity in part because the plaintiff "was not suspended *from school* on the basis of her speech but rather suspended from her participation on the cheer squad"). Other circuits have noted that the extracurricular context may give rise to its own

constitutional limitations, in part because "student athletes are subject to more restrictions than the student body at large." *Lowery v. Euverard*, 497 F.3d 584, 589 (6th Cir. 2007) (citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995)); *see also Wildman ex rel. Wildman v. Marshalltown Sch. Dist.*, 249 F.3d 768, 772 (8th Cir. 2001) (finding no constitutional violation where a basketball player was dismissed from the team for using "insubordinate speech toward her coaches").

In the absence of a case providing a general rule that could have placed defendants on notice, we decline to find that M.L.'s free speech rights were clearly established at the time that she was dismissed from the cheerleading team. Accordingly, we affirm the district court's holding that the individual defendants are entitled to qualified immunity.

B.

Before addressing M.L.'s remaining claims, we briefly synthesize the school speech law identified above. We note that the lack of clarity in the case law has given rise to frequent calls from commentators asking courts to "more clearly delineate the boundary line between off-campus speech entitled to greater First Amendment protection, and on-campus speech subject to greater regulation." *Porter*, 393 F.3d at 619–20 (citing scholarship). Much of our case law on these issues has resulted in a finding of qualified immunity, thus "bypass[ing]" an ultimate determination on the constitutional limits of official action "again, and again, and again." *Camreta v. Greene*, 563 U.S. 692, 706 (2011) ("[T]he qualified immunity situation threatens to leave standards of official conduct permanently in limbo.").

First, nothing in our precedent allows a school to discipline non-threatening off-campus speech simply because an administrator considers it "offensive, harassing, or disruptive." *Bell*, 799 F.3d at 402 (Elrod and Jones, JJ., concurring); *see also id.* (observing that "the First Amendment does not,

for example, allow a public school to punish a student for 'writ[ing] a blog entry defending gay marriage' from his home computer, even if the blog entry causes a substantial disruption at the school" (citing *Snyder*, 650 F.3d at 939 (Smith, J., concurring)). Second, it is "indisputable" that non-threatening student expression is entitled to First Amendment protection, even though the extent of that protection may be "diminished" if the speech is "composed by a student on-campus, or purposefully brought onto a school campus." *Porter*, 393 F.3d at 618–19. And finally, as a general rule, speech that the speaker does not intend to reach the school community remains outside the reach of school officials. *See id.* at 615 (holding that a student drawing that was "completed in [the student's] home, stored for two years, and never intended by him to be brought to campus" does not "constitute[] student speech on the school premises"); *see also Bell*, 799 F.3d at 395. Because a school's authority to discipline student speech derives from the unique needs and goals of the school setting, a student must direct her speech towards the school community in order to trigger school-based discipline. We acknowledge, however, that the "pervasive and omnipresent nature of the Internet" raises difficult questions about what it means for a student using social media to direct her speech towards the school community. *Id.*

We express no opinion whether M.L.'s dismissal from the cheerleading team violated these principles, and we rest our holding instead on our conclusion that there was no clearly-established law that placed M.L.'s rights beyond debate at the time of the sanction—particularly given the unique extracurricular context here. We recognize that the articulation of these rules still leaves many questions unanswered, and a more defined rule will be left for another day. *Bell*, 799 F.3d at 403. Given these principles, however, we hope to give some guidance to schools for the future, with the important reminder

No. 18-41060

that "a broad swath of off-campus student expression" remains fully-protected by the First Amendment. *Id.* at 402 (Elrod and Jones, JJ., concurring).

IV.

The magistrate judge recommended dismissal of M.L.'s vagueness and overbreadth claims, concluding that M.L. failed to assert these claims in her complaint and instead impermissibly raised them for the first time in her reply brief. M.L. did not object to the report and recommendation on this basis, and the district court did not explicitly reach the issue. A party's failure to object to a magistrate judge's report and recommendation restricts the appeals court to a "plain error" standard of review. *See Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 248 (5th Cir. 2017) (citing *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996), *superseded on other grounds by* 28 U.S.C. § 636(b)(1)). To show plain error, a litigant must show a "clear or obvious error that affected substantial rights or seriously affected the fairness or integrity of the judicial proceeding." *United States v. McGill*, 74 F.3d 64, 68 (5th Cir. 1996) (citing *United States v. Calverley*, 37 F.3d 160, 162 (5th Cir. 1994)). We cannot say that the magistrate judge's conclusion was clearly erroneous, and we therefore affirm the dismissal of these claims.[10]

Moreover, these claims would fail even if M.L. had properly asserted them in her complaint. To state a void-for-vagueness claim, a plaintiff must allege that she was deprived of a property or liberty right. *See City of Chicago v. Morales*, 527 U.S. 41, 58 (1999). We have held, however, that "[a] student's interest in participating in a single year of interscholastic athletics amounts to

---

[10] On appeal, plaintiffs point to a single allegation in the "Facts" section of their complaint, which states, "Plaintiffs in their Level 1 grievance went on to show that the Cheerleading Constitution is vague as to what type of social media posting constitutes a violation." This cannot be read to assert a vagueness claim as it explains only the arguments plaintiffs made in the *grievance* they filed with Sanchez.

a mere expectation rather than a constitutionally protected claim of entitlement." *Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 159 (5th Cir. 1980). With respect to overbreadth, such a claim is "not permitted where a party raises only situations that are essentially coterminous with [her] own conduct." *Seals v. McBee*, 898 F.3d 587, 599 (5th Cir. 2018) (internal quotation marks and citation omitted). Beyond her own social-media activity, M.L. fails to allege any additional conduct that would be unconstitutionally prohibited under the Cheerleading Constitution, so her overbreadth claim would fail even if it had been properly raised in the complaint.

V.

Finally, we affirm the district court's dismissal of M.L.'s municipal-liability claim. M.L. seeks to hold the San Benito Independent Consolidated School District liable for the alleged violation of her First Amendment rights. Section 1983 does not make municipalities vicariously liable for the wrongdoing of their employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, in order to hold a municipality liable for a constitutional violation under § 1983, a plaintiff must show that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Hicks-Fields v. Harris County*, 860 F.3d 803, 808 (5th Cir. 2017) (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009)). The plaintiffs argue that the Board of Trustees may be held liable for either promulgating the Cheerleading Constitution itself or delegating the authority to do so to Sanchez, who exercised policymaking authority when he made a final decision on the meaning of "inappropriate" social-media behavior under the Cheerleading Constitution.

"[T]he identification of policymaking officials is a question of state law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). Both parties agree

that Texas law establishes the San Benito Board of Trustees as the school district's policymaking body. *See* Tex. Educ. Code Ann. § 11.151(b) ("The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district."). Because the "specific identity of the policymaker is a legal question that need not be pled," plaintiffs can state a claim for municipal liability as long as they plead sufficient facts to allow the court to reasonably infer that the Board either adopted a policy that caused M.L.'s injury or delegated to a subordinate officer the authority to adopt such a policy. *Groden v. City of Dallas*, 826 F.3d 280, 284, 286 (5th Cir. 2016). In other words, plaintiffs must plead facts that sufficiently connect the policymaker—the Board of Trustees—to the allegedly unconstitutional policy—the Cheerleading Constitution. *Id.*

We agree with the district court that the plaintiffs failed to meet this burden. Indeed, during oral argument, plaintiffs acknowledged that their complaint failed to connect the Cheerleading Constitution to the Board, acknowledging that they could not point to any facts in the complaint that alleged that the Board was responsible for promulgating and adopting the Constitution. In their complaint, plaintiffs make no allegations about the drafter of the Constitution or its origins. This case is thus distinct from those where we have found that a plaintiff adequately connected a policy to the policymaker. *See, e.g.*, *id.* at 286 (holding that the plaintiff stated a claim for municipal liability where the complaint alleged that the official city spokesperson "publicly announced a new policy").

Plaintiffs likewise fail to plead sufficient facts to allow the court to draw an inference that the Board of Trustees delegated policymaking authority to Sanchez. A municipality can be held liable only when it delegates policymaking authority, not when it delegates *decisionmaking* authority. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *Jett v. Dallas Indep. Sch. Dist.*,

7 F.3d 1241, 1246–47 (5th Cir. 1993). Plaintiffs argue that Sanchez exercised policymaking authority when he rendered a final decision on M.L.'s dismissal from the cheerleading team, but the "finality of an official's action does not . . . automatically lend it the character of a policy," *Bolton v. City of Dallas*, 541 F.3d 545, 550 (5th Cir. 2008); *see also Jett*, 7 F.3d at 1246. The Supreme Court's cases "sharply distinguish[] between decisionmakers and final policymakers." *Jett*, 7 F.3d at 1247. Without additional allegations that demonstrate Sanchez possessed delegated policymaking authority, plaintiffs fail to state a claim for municipal liability. Thus, we affirm the district court's dismissal of this claim.

## VI.

For the foregoing reasons, the judgment of the district court is AFFIRMED.